IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| Grand Canyon Trust,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>Energy Fuels Resources (U.S.A.) Inc., EFR White Mesa LLC, Energy Fuels Inc., and Energy Fuels Holding Corp.,<br><br>　　　　　　　Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:14-cv-243<br><br>Judge Clark Waddoups |

Before the court are cross-motions for summary judgment filed by Plaintiff Grand

Canyon Trust (the Trust) and Defendants EFR White Mesa LLC and Energy Fuels Resources

(U.S.A.) Inc.[1] (collectively, the Mill). (Dkt. Nos. 67 & 60.) The motions seek resolution of the

five claims the Trust set forth in its Amended Complaint, which seek declaratory and injunctive

relief as well as civil penalties for the Mill's alleged violations of the EPA's radon emission

regulations. (Dkt. No. 29.) The court heard oral argument on the motions on November 17, 2016.

(Dkt. No. 89.) After carefully considering the arguments presented in the briefing and oral

argument and reviewing the numerous exhibits and declarations each party presented, the court

now GRANTS the Mill's motion, DISMISSES those claims with prejudice, and DENIES the

Trust's motion.

---

[1] This case has been bifurcated into liability and penalty phases. (Dkt. Nos. 49 & 54 pp. 2–3.) Only the two above-referenced defendants are party to these motions. Energy Fuels Inc. and Energy Fuels Holding Corp. had agreed to guarantee payment of any monetary penalties and timely performance of any injunctive orders, if the court had found liability on any of the claims. (Dkt. No. 49 pp. 3–4.)

At issue is whether the Mill complied with radon emission regulations and, even if it did not, if the Trust's enforcement action is proper under the Clean Air Act's citizen-suit provision and Article III of the Constitution. The following identifies the parties, provides an overview of the relevant regulatory scheme, describes the conduct that the Trust contends violated those regulations, and details the purported effects those violations have had on Trust members.

## 1. The Parties

### a. The Mill

White Mesa Mill is a conventional uranium mill located six miles south of Blanding, Utah near the Ute Mountain Ute tribal community of White Mesa on the Colorado Plateau. (Dkt. No. 63 Ex. 14 EFR 457–58; Dkt. No. 68 Ex. 38 ¶ 6 & Ex. 40 ¶¶ 1–2.) The Mill was first constructed in 1979 and operations commenced there in 1980. (Dkt. No. 61 ¶ 5; Dkt. No. 63 Ex. 14 EFR 459.) The Mill applies conventional grinding and leaching processes to mined ore and byproduct material in order to extract uranium and vanadium in the forms of yellowcake and black flake, respectively. (Dkt. No. 61 ¶ 5; Dkt. No. 63 Ex. 11 EFR 306–07.) Production of yellowcake and black flake results in a waste stream that contains tailings solids and processing solutions. (Dkt. No. 61 ¶ 8; Dkt. No. 68 Ex. 5 & Ex. 12 pp.19–20.) That waste then enters the tailings management system, which separates liquid and solid waste. (Dkt. No. 61 ¶¶ 6–10; Dkt. No. 63 Ex. 15 EFR 650.) Any liquids that may still contain some ore-bearing solids are returned to the milling process. (Dkt. No. 61 ¶¶ 6–10; Dkt. No. 63 Ex. 15 EFR 650.)

The Mill was originally licensed under the Atomic Energy Act of 1954, as amended by the Uranium Mill Tailings Radiation Control Act of 1978, by the Nuclear Regulatory

Commission. *Energy Fuels Resources (USA) Inc.*, Utah Department of Environmental Quality, https://deq.utah.gov/businesses/E/energyfuels/whitemesamill.htm (last visited Sept. 15, 2017). In 2004, Utah became an Agreement State, and oversight of the Mill transferred to the Utah Division of Radiation Control that is now a part of the Utah Division of Waste Management and Radiation Control (UDWMRC). *Id.* The Mill also operates under a Groundwater Discharge Permit, which UDWMRC oversees. *Id.* The Mill's radon emissions are governed by the Clean Air Act and regulations the Environmental Protection Agency (EPA) set and that Utah's Department of Air Quality (DAQ) administers. *Id.*

### b. The Trust

The Grand Canyon Trust is a nonprofit advocacy organization with over 3,000 members. (Dkt. No. 68 Ex. 38 ¶ 2.) It is based in Arizona with offices in Colorado and Utah. (*Id.*) Its mission, according to its Executive Director, William L. Hedden, is to "protect and restore the Colorado Plateau," which "stretches south-to-north from roughly the Mogollon Rim in northern Arizona and the Uinta Mountains in northern Utah and east-to-west from the Great Basin in Utah to the western side of the Rocky Mountains in Colorado and northwestern New Mexico" and encompasses the land upon which the Mill is located. (*Id.* ¶ 3.)

The Trust aims to protect the landscape, rivers, air, plant and animal life, beauty, and solitude within the Colorado Plateau. (*Id.*) The Trust opposes "irresponsible uranium mining and milling on the Plateau" and seeks to see contamination from uranium mining removed and the area reclaimed. (*Id.* ¶ 4.) As such, the Trust has worked to clean up abandoned surface tailings piles on the former site of another mill; campaigned to raise funds through legislation for cleanup where reclamation bonds were insufficient; advocated an end to uranium mining on the Plateau,

including lobbying for legislation that would permanently end the staking of new claims around the Grand Canyon; developed a water quality monitoring program; submitted comments on permitting decisions for White Mesa Mill and other uranium operations on the Plateau; lobbied for changes to uranium regulations; and brought lawsuits aimed at protecting areas threatened by pollution that can be linked to the uranium industry. (*Id.* ¶¶ 4–6.)

The Trust sued the Mill on April 2, 2014, to enforce violations by the Mill of the Clean Air Act (CAA). (Dkt. No. 2 ¶ 1.) The Trust contends that this action "seeks to promote the same interests that underlie essentially all the Trust's work," that is "to protect the environment of the Colorado Plateau and the health of those who live on or visit it." (Dkt. No. 68 Ex. 38 ¶ 7.)

## 2. Regulatory Background

Congress enacted the CAA "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401. In furtherance of that goal, Congress identified a list of hazardous air pollutants (HAPs), each of which is subject to the EPA's review and revision. *Id.* § 7412. It listed radionuclides, including radon, as HAPs. *Id.* § 7412(c). Congress also required the EPA to "promulgate regulations establishing emission standards for . . . major sources and area sources of hazardous air pollutants . . . in accordance with" the CAA. *Id.* § 7412(d).

The EPA then promulgated the National Emission Standard for Hazardous Air Pollutants (NESHAPs), which set emission limits for listed HAPs according to category and subcategory of potential polluters. *See generally* 40 C.F.R. § 61. Relevant to this case are the Subpart W NESHAPs, which set out the "National Emission Standards for Radon Emissions from Operating Mill Tailings" and which took effect on December 15, 1989. *See* Subpart W—National Emission

Standards for Radon Emissions from Operating Mill Tailings, 54 Fed. Reg. 51,703 (December 15, 1989) (codified at 40 C.F.R. § 61.250–256). Prior to December 1989, Subpart W had previously been promulgated in 1986. Subpart W—National Emission Standards for Radon Emissions from Operating Mill Tailings, 51 Fed. Reg. 34, 056 (Sept. 24, 1986). And it was subsequently amended on March 21, 2017. Revisions to National Emission Standards for Radon Emissions from Operating Mill Tailings, 82 Fed. Reg. 5,142 (Jan. 17, 2017).[2]

Subpart W sets two standards—one for existing uranium mill tailings piles and one that is triggered by newly built tailings impoundments but that applies to all tailings impoundments once it is triggered. 40 C.F.R. § 61.252. First, Subpart W capped emission of radon-222 into the ambient air from existing sources at 20 pCi/(m$^2$-sec) (1.9 pCi/(ft$^2$-sec). *Id.* § 61.252(a). Compliance with this limitation—the radon flux limit—is monitored according to Method 115. *Id.* § 61.253. Method 115 requires radon flux measurements to be taken from the following regions of each tailings pile: (1) the water-saturated areas or beaches; (2) the dry top-surface area; and (3) the sides, unless they are made of dirt. 40 C.F.R. Pt. 61, Appx. B. ("Method 115") §§ 2.1.2 & 3. It does not require measurement of "water covered area[s]." *Id.* § 2.1.3.

When such monitoring is conducted over a one-year period, the facility must provide the EPA with a monitoring schedule showing the "measurement frequency to be used." 40 C.F.R. § 61.253. Measurements can be conducted once per year or more frequently, so long as it is done on "quarterly, monthly or weekly intervals." Method 115 § 2.1.1. The schedule may be submitted before or after the first measurement, and EPA must receive thirty days' notice before any testing so that it may observe. 40 C.F.R. § 61.253. The test results, no matter how frequently

---

[2] Except where explicitly stated otherwise, the court refers to the 1989 version of Subpart W, which governs the five alleged violations in this case.

taken, must be reported to the EPA by March 31 of the following year. *Id.* § 61.254. If the annual report reveals that the facility is not in compliance with the radon flux limit, the facility must make monthly reports beginning the month immediately following the noncompliant annual report. *Id.* § 61.254(b). And it must do so until the EPA or state agency determines monthly reporting is no longer necessary. *Id.* Such monthly reports should include updated test results and plans to control or modify operations to bring the facility into compliance. *Id.*

Second, Subpart W limits the total number of tailings impoundments operated at a facility beginning from the time an impoundment is newly built if it is constructed after 1989. Construction of a new impound is not permitted unless it is designed, constructed, and operated in compliance with the following: does not exceed forty acres; meets the requirements of the Nuclear Regulatory Commission set out in 40 CFR § 192.32(a); and does not cause the owner or operator to exceed two total impoundments, including previously existing impoundments, even those that were constructed prior to the 1989 version of Subpart W. *Id.* § 61.252(b). In other words, once a new tailings impoundment is constructed, all existing impoundments count toward the two cell limit, as does the newly constructed impoundment. This is referred to as the phased disposal work practice.

In addition to delegating to the EPA the duties of maintaining the list of HAPs and developing HAP regulations, Congress also invited state involvement in HAP regulation. 42 U.S.C. § 7412(l)(1). Specifically, Congress authorized the states to apply to the EPA for approval of a program to implement and enforce emission standards. *Id.* State programs "may provide for partial or complete delegation of the Administrator's authorities and responsibilities to implement and enforce emissions standards and prevention requirements," so long as state

standards are no less than the EPA's. *Id.* The CAA sets out criteria for approval of a state

program and allows for state revision if a program is not approved initially. *Id.* § 7412(1)(5). The

CAA also provides for EPA oversight of state regulation, requiring the Administrator to

"withdraw approval of the program" if "the Administrator determines, after public hearing, that a

State is not administering and enforcing [its] program . . . in accordance with [EPA] guidance . . .

or the requirements of [the subsection]" and if after notification the state fails to comply within

ninety days. *Id.* § 7412(l)(6). The statute further says that "[n]othing in this subsection shall

prohibit the Administrator from enforcing any applicable emission standard or requirement under

this section." *Id.* § 7412(l)(7). In sum, the CAA invites state involvement in HAP regulation, but

it also vests significant authority in the EPA to review state activity and to regulate alongside the

state where it sees fit.

Utah satisfied all statutory and regulatory requirements for delegation in 1995 and,

effective May 15, 1995, the EPA "delegate[d] its authority for the implementation and

enforcement of [many of the] . . . National Emission Standards for Radionuclides for all sources

located, or to be located in the State of Utah," including Subpart W. Approval of Delegation of

Authority; National Emission Standards for Hazardous Air Pollutants; Radionuclides; Utah, 60

Fed. Reg. 13,912–13 (March 15, 1995). Thus, Subpart W was administered in Utah by the EPA

from 1989 until 1995 and then by DAQ beginning in 1995. (Dkt. No. 64 ¶¶ 4–5.)

### 3. The Alleged Violations

#### a. *Claim 2: Number of Tailings Impoundments*

The Mill operates as a zero-discharge facility, which means it is required to dispose of waste, including tailings,[3] on site as they are produced. (Dkt. No. 61 ¶¶ 10 & 12; Dkt. No. 63 Ex. 17 EFR 6369; Dkt. No. 68 Ex. 9 pp. 86–87 & 109–112.) To do so, the Mill operates a tailings-management system for storing and disposing of waste materials and liquids. (Dkt. 60 p. 15; Dkt. 60 Ex. 1; Dkt. No. 68 Ex. 9 p. 45.) The tailings management system consists of a series of evaporation ponds and tailings impoundments: Cells 1, 2, 3, 4A, and 4B. (Dkt. No. 61 ¶ 6; Dkt. No. 63 Ex. 14 & Ex. 15; Dkt. No. 68 Ex. 9 p. 45.) A sixth basin, Roberts Pond, was also on site until 2014.[4] (Dkt. No. 61 ¶ 28; Dkt. No. 68, Ex. 9 pp. 201–02, Ex. 10 EFR 21069, Ex. 11 EFR 4562, & Ex. 12 p. 16.) Other than Roberts Pond, each cell receives, or previously received, either process solutions or a slurry containing tailings solids. (Dkt. No. 61 ¶ 8; Dkt. No. 63 Ex. 14 EFR 459–62 & Ex. 15 EFR 649–50.) The cells that receive the tailings slurry hold the substance while the solids separate from the liquid and settle at the bottom of the cell. (Dkt. No. 68 Ex. 9 p. 30.) The solids consist of a sand-like substance. (Dkt. No. 68 Ex. 15 p. 7.) As the solids settle, they stabilize and begin to fill the cell, allowing the Mill to install an interim cover that prevents tailings from blowing out of their impoundment and begins the reclamation

---

[3] Tailings, as used in common parlance, means "residue separated in the preparation of various products (such as grain or ores)." *Tailings*, Merriam-Webster Dictionary (Online ed. 2017), https://www.merriam-webster.com/dictionary/tailings?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited Sept. 15, 2017. This definition is generally sufficient to understand the facts presented here; however, as discussed, the definition of "tailings" as it is used in Subpart W is at issue in the motions now before the court and is further addressed in the court's analysis.

[4] The Trust contends that Roberts Pond is also a part of the tailings management system and that it was a tailings impoundment before it was filled in 2014. (Dkt. No. 67 p. 64.) The Mill contradicts this, arguing that Roberts Pond was unrelated to the tailings management system. (Dkt. No. 76 pp. 48–49.) Because of the court's conclusion regarding the statute of limitations it does not reach the factual issue of whether Roberts Pond was a tailings impoundment or in any way affiliated with the tailings management system.

process. (Dkt. No. 61 ¶ 9; Dkt. No. 63 Ex. 15 EFR 650 & Ex. 17 EFR 6368–69.) Any excess liquid is then transferred to the evaporation ponds. (Dkt. No. 68 Ex. 9 pp. 27–28.)

Evaporation ponds hold the liquid, called raffinate or S/X (solvent solution), either for evaporation as a method of disposal or for temporary storage until the liquid can be further processed for uranium and vanadium values. (Dkt. No. 61 ¶¶ 8 & 10; Dkt. No. 68 Ex. 9 p. 32.) On occasion, the evaporation ponds may become entirely dry, revealing raffinate crystals at the bottom. (Dkt. No. 61 ¶ 11; Dkt. No. 63 Ex. 14 EFR 459; Dkt. No. 68 Ex. 9 p. 50 & Ex. 16 pp. 147–148.) When this happens, the crystals are removed and placed into the tailings impoundments. (Dkt. No. 63 Ex. 14 EFR 459.) Raffinate crystals were removed from Cell 4B in 2006 and disposed in Cell 3. (*Id.*)

The Mill completed construction of Cell 1 in June 1981 and has used it exclusively as an evaporation pond since that date. (Dkt. No. 61 ¶ 14; Dkt. No. 63 Ex. 14 EFR 459.) Cell 1 receives raffinate solutions, process solutions from other cells, liquids from the Mill's laboratory, and storm water runoff. (Dkt. No. 61 ¶ 14.) Cell 1 has never received tailings solids. (Dkt. No. 63 Ex. 14 EFR 467; Dkt. No. 68 Ex. 12 pp. 17 & 22.)

The Mill completed construction of Cell 2 in May 1980. (Dkt. No. 63 Ex. 14 EFR 459.) The parties do not dispute that Cell 2 received tailings solids from its construction and that it was a tailings impoundment. (Dkt. No. 67 p. 37; Dkt. No. 76 p. 25.) Cell 2 received tailings solids until sometime after the late 1980's but before 2008. (Dkt. No. 61 ¶ 15; Dkt. No. 68 Ex. 16 pp. 164–66.) It stopped receiving tailings when it was full to capacity pursuant to its Radioactive Material License and Groundwater Discharge Permit. (Dkt. No. 61 ¶ 15; Dkt. No. 68 Ex. 9 pp. 83–84, Ex. 14 EFR 43535, & Ex. 16 pp. 193–95.) Once Cell 2 was full and no longer

receiving tailings, the Mill began dewatering Cell 2 according to the final closure methods outlined in its Reclamation Plan.[5] (Dkt. No. 61 ¶ 16; Dkt. No. 68 Ex. 22 & Ex. 56.) The parties agree that some closure activity has occurred, but they disagree on the legal issue of whether Cell 2 has entered "final closure" as that term is used in Subpart W. (Dkt. No. 67 pp. 60–64; Dkt. No. 76 pp. 45–48.)

The Mill completed construction of Cell 3 in September 1982. (Dkt. No. 61 ¶ 17; Dkt. No. 63 Ex. 14 EFR 459.) The sides of Cell 3 are made of earthen material. (Dkt. No. 61 ¶ 17; Dkt. No. 63 Ex. 14 EFR 464.) Since its construction, Cell 3 has received tailings impoundments from the tailings pipeline as well as process solutions from other cells. (Dkt. No. 61 ¶ 17; Dkt. No. 63 Ex. 15 EFR 647, 650.) This began in the 1980s. (Dkt. No. 68 Ex. 14 EFR 43535.) The parties do not dispute that Cell 3 is a tailings impoundment. (Dkt. No. 67 p. 36; Dkt. No. 76 p. 22.) In April 2016, the Mill reported that Cell 3 was almost full with tailings but had a small area where new tailings were being deposited. (Dkt. No. 61 ¶ 17; Dkt. No. 63 Ex. 15 EFR 650.)

The Mill first proposed Cells 4A and 4B as a single eighty-acre cell, but in anticipation of the adoption of the 1989 revisions to Subpart W, the Mill proposed splitting the cell into two. (Dkt. No. 61 ¶ 18; Dkt. No. 63 Ex. 2 EFR 373; Dkt. No. 68 Ex. 8 EFR 646–47.) The Mill then applied to the Nuclear Regulatory Commission and the EPA for permission to construct Cell 4A in 1989. (Dkt. No. 61 ¶ 18; Dkt. No. 63 Ex. 1.) The EPA approved the Mill's application under the 1986 version of Subpart W on March 16, 1989. (Dkt. No. 61 ¶ 19; Dkt. No. 63 Ex. 46.) The Approval Order for the Mill was later updated on June 26, 1989, to authorize construction of cells 4A and 4B. (Dkt. No. 61 ¶ 20; Dkt. No. 63 Ex. 2.) Construction of Cell 4A was

---

[5] The court makes no findings regarding the finality or legal implications of the Reclamation Plan in any of its iterations, as doing so is unnecessary in light of the court's disposition of Claim 2.

substantially complete on November 30, 1989, and the NRC approved it to receive process solutions on December 21, 1989. (Dkt. No. 61 ¶ 21; Dkt. No. 63 Ex. 3 & Ex. 14 EFR 459.) The NRC did not approve receipt of tailings at that time but then amended the license to allow tailings on March 1, 1990. (Dkt. No. 61 ¶ 21; Dkt. No. 63 Ex. 4.) Cell 4A received process solutions in 1990. (Dkt. No. 61 ¶ 21; Dkt. No. 63 Ex. 14 EFR 459.) After 1990, Cell 4A was not used and the liner suffered thermal stress as a result of direct sunlight. (Dkt. No. 61 ¶ 22; Dkt. No. 63 Ex. 14 EFR 459.) This drying caused raffinate crystals to form, which were removed and disposed of in Cell 3 in the mid-2000s. (Dkt. No. 61 ¶ 22; Dkt. No. 63 Ex. 14 EFR 459.) Cell 4A was relined in 2007 and 2008 and, after DRC approved it for use on September 17, 2008, began receiving tailings solids in October 2008. (Dkt. No. 61 ¶ 22; Dkt. No. 68 Ex. 12 p. 23 & Ex. 16 p. 153.)

In June 2008, the Mill applied for approval from DRC to construct Cell 4B, which had originally been contemplated in 1989 but was not constructed. (Dkt. No. 61 ¶ 23; Dkt. No. 63 Ex. 10 & Ex. 14 EFR 459–60.) Then on April 13, 2010, the Mill applied for approval to construct Cell 4B from DAQ pursuant to Subpart W; EPA also received a copy of the application. (Dkt. No. 61 ¶ 24; Dkt. No. 63 Ex. 15.) The application indicated that Cell 4B would not be used as a tailings impoundment as long as Cells 3 and 4A were receiving tailings solids and that it would instead be used as an evaporation pond along with Cell 1. (Dkt. No. 61 ¶ 24; Dkt. No. 63 Ex. 15 EFR 649–50 & 653.) The Mill's application assumed Cell 2 was in closure. (Dkt. No. 63 Ex. 15 EFR 653.) DAQ approved the application, saying "our review determined that these facilities will not cause emissions in violation of the standard found in 40 C.F.R. 61.252, if properly operated." (Dkt. No. 61 ¶ 25; Dkt. No. 63 Ex. 16.) The Mill began

construction of Cell 4B in November 2010. (Dkt. No. 68 Ex. 17 p. 6.) DRC granted the Mill final approval to operate Cell 4B on January 31, 2011. (Dkt. No. 61 ¶ 26; Dkt. No. 63 Ex. 18.) And in either January or February of 2011, the Mill began moving processing solutions from Cell 4A into Cell 4B. (Dkt. No. 68 Ex. 9 p. 26, Ex. 13 pp. 5–6, & Ex. 18 DEQ 52.) At the time the Trust filed its motion for summary judgment, Energy Fuels continued to operate Cell 4B as an evaporation pond. (Dkt. No. 68 Ex. 16 pp. 131–32 & 134.)

Roberts Pond is a one-acre retention basin that dates to the original construction of the Mill in the early 1980's and that the Mill took out of service in March of 2014 and backfilled and regraded by early 2016. (Dkt. No. 61 ¶¶ 28 & 30; Dkt. No. 68 Ex. 9 pp. 193–94 & 197–98 & Ex. 12 p. 16.) Roberts Pond was used as a catch basin for process upsets and overflows and to capture storm water runoff. (Dkt. No. 61 ¶ 28; Dkt. No. 68 Ex. 9 pp. 193–95.) It is undisputed that upon its closure, there were materials that contained uranium in Roberts Pond, as evidenced by the Mill's having returned such materials to the ore pad for processing or deposited them into a tailings impoundment. (Dkt. No. 61 ¶ 28; Dkt. No. 68 Ex. 9 pp. 201 & 204–06, Ex. 10 EFR 21069, & Ex. 19 EFR 23930.) The Mill cleaned up Roberts Pond in July 2012 and again in 2014. (Dkt. No. 68 Ex. 10 EFR 21069 & Ex. 11.)

Therefore, it is undisputed that at the time of the briefing of the instant motions, Cells 3 and 4A were serving as tailings impoundments. It is also undisputed that Cells 1 and 4B were at that time operating as a part of the tailings management system as evaporation ponds and that evaporation ponds are a necessary and approved part of its methods. (Dkt. No. 68 Ex. 9 85–87 & 90–92; Dkt. No. 77 Ex. 6 p. 6,389.)

*b. Claims 1, 3, 4, and 5: Radon Emissions Testing*

The tailings impoundments that existed before December 15, 1989, are subject to monitoring requirements pursuant to Method 115 and the reporting requirements set out in Subpart W. 40 C.F.R. §§ 61.253–254; Method 115 §§ 2.1.2–3. Although any "tailings pile" falls under those reporting requirements, only testing of Cell 2 in 2012 and 2013 and Cell 3 in 2013 are now before the court.

*i.    Cell 2*

On May 4, 2012, the Mill notified DAQ and the EPA that it would measure radon emissions from Cells 2 and 3 between June 11 and 15, 2012. (Dkt. No. 68 Ex. 23 EFR 35272.) The results of those tests revealed that Cell 2 exceeded the regulatory limit by emitting radon-222 at 23.1 pCi/(m$^2$-sec), based on an average of each of the tested areas. (Dkt. No. 68 Ex. 24 EFR 35276.)

The Mill then determined to conduct further testing during 2012. (Dkt. No. 68 Ex. 16 pp. 49–52.) On August 3, 2012, it notified DAQ and the EPA of this intention and that it would retest Cell 2 in September and November or early December. (Dkt. No. 68 Ex. 25 EFR 35274.) The September test again exceeded the radon flux limit, this time measuring 26.6 pCi/(m$^2$-sec). (Dkt. No. 68 Ex. 27 EFR 31861.) The Mill then tested in October, which yielded still higher results of 27.7 pCi/(m$^2$-sec), and November, which returned 26.1 pCi/(m$^2$-sec). (Dkt. No. 84 Ex. 1 p. 2.) Therefore, Cell 2 exceeded the radon flux limit in 2012, averaging 25.9 pCi/(m$^2$-sec). (Dkt. No. 68 Ex. 26 GCT 8875.)

On March 29, 2013, the Mill reported the 2012 radon flux results for Cell 2 to DAQ. (Dkt. No. 62 ¶ 7; Dkt. No. 63 Ex. 21.) The report demonstrated an increase in radon flux and

13

included the Mill's proposed plan to bring the results back under the standard by adding cover and engaging in monthly sampling. (Dkt. No. 62 ¶ 7; Dkt. No. 68 Ex. 26 GCT 8875–83.) Pursuant to 40 C.F.R. § 61.254(b), the Mill began monthly monitoring and reporting in April 2013. (Dkt. No. 68 Ex. 26 GCT 8872 & 8883.)

The Mill tested Cell 2 monthly in 2013 because of its 2012 violation. On April 3, 2014, the Mill reported that Cell 2 remained in violation of the radon flux limit and reported an average of its radon-222 emissions between April and December 2013 of 20.4 pCi/(m$^2$-sec). (Dkt. No. 68 Ex. 29 GCT 8226.) It further reported that Cell 2 had reported emissions below 20.0 pCi/(m$^2$-sec) since September 2013. (*Id.* GCT 8228.) It submitted a table of the monthly averages in its annual compliance report, which showed that Cell 2's radon-222 emissions were below 20.0 pCi/(m$^2$-sec) for five of the previous nine months and had not exceeded 20.0 pCi/(m$^2$-sec) since August 2013. (*Id.* GCT 8237.) The report attributed the high emissions levels to the dewatering process mandated by its groundwater permit and identified certain remediation measures it had already taken. (*Id.* GCT 8234–35.)

To remediate the Cell 2 radon flux violation, the Mill covered "hot spots" where radon flux readings were highest. (Dkt. No. 62 ¶ 8; Dkt. No. 63 Exs. 25–29.) It also removed tailings that had blown from Cell 3 into Cell 2 and constructed a five-foot berm to reduce future windblown tailings. (Dkt. No. 62 ¶ 8; Dkt. No. 63 Ex. 25 EFR 1000.) And the Mill covered large areas of Cell 2 with additional cover to fortify the platform fill cover that was already in place. (Dkt. No. 62 ¶¶ 8 & 14; Dkt. No. 63 Ex. 40.) These efforts appear to have worked, as the Mill reported below standard radon-222 levels in September 2013 and continuing until May 2014 when they submitted a request to DAQ for permission to cease monthly monitoring. (Dkt. No. 62

¶¶ 10–11; Dkt. No. 84 Ex. 1.) DAQ granted the Mill's request on July 23, 2014, and informed

the Mill that DAQ and DRC agreed that Cell 2 was closed and therefore was not actually subject

to Subpart W, but that it would be required to conduct semiannual radon monitoring to maintain

its radiation permits. (Dkt. No. 62 ¶ 12; Dkt. No. 63 Ex. 38.) While the Mill awaited DAQ's

response to its request to cease testing, it tested in May, June, and July 2014. (Dkt. No. 62 ¶ 13;

Dkt. No. 84 Ex. 1.) In July radon emissions slightly exceeded the limit, and the Mill added

additional platform fill in August and November of 2014. (Dkt. No. 62 ¶¶ 13–14; Dkt. No. 84

Ex. 1.)

> ii.    Cell 3

In April 2013, the Mill notified DAQ that it would perform an "annual sampling event"

of Cell 3 between June 10 and 13, 2013. (Dkt. No. 68 Ex. 31 EFR 35264.) The June test results

were 22.7 pCi/(m$^2$-sec) (Dkt. No. 68 Ex. 30 GCT 8293 & Ex. 32 EFR 24924), so the Mill

submitted an amended schedule on July 18, 2013, identifying planned tests for September 2013

and "Late November/Early December" (Dkt. No. 68 Ex. 33 EFR 992). It modified the schedule

again on September 5, 2013, setting another round of testing between December 2 and 4, 2013.

(Dkt. No. 68 Ex. 34 EFR 1067.) In its annual report, the Mill reported yearly average radon-222

emissions from Cell 3 of 19.4 pCi/(m$^2$-sec). (Dkt. No. 68 Ex. 30 GCT 8280.)

After June 2013, the Mill only tested Cell 3's cover region, not its beach. (Dkt. No. 84

Ex. 2 p. 2.) It averaged the June beach measurement with the September and December

measurements of the covered region to reach the annual average of 19.4 pCi/(m$^2$-sec). (Dkt. No.

68 Ex. 30 GCT 8280, 8318, 8320, 8351, & 8353.) The Mill had not previously, nor has it since,

used this method for measuring and calculating compliance with the radon flux limit. (Dkt.

No. 84 Ex. 2.) The Mill did not measure the sides of Cell 3 because they were built with dirt and therefore excluded from Method 115. Method 115 § 2.1.2.

DAQ received all of the scheduling and measurement location information, but never pursued a violation of Cell 3. The head of Minor Source Compliance for DAQ, Jay Morris, stated in his declaration to the court that he knew of the Trust's concerns "regarding the way Cell 3's radon flux sampling was conducted by the Mill in 2013" but that DAQ accepted the Mill's sampling results because they "met [DAQ's] requirements, . . . [DAQ] knew that the Mill was taking steps to address those areas of Cell 3 with high radon levels, and . . . the sampling results showed a trajectory of improvement sufficient to allow [DAQ] to conclude that the standard was being met." (Dkt. No. 65 ¶ 8.) He knew of the scheduling concerns but believed Subpart W's scheduling requirement was flexible and permitted the Mill to amend its schedule as needed. (*Id.* ¶ 9.) He also knew the Mill did not retest the beach in September and December 2013, but DAQ did not treat this as a violation because of the Mill's steps to mitigate high radon areas and because of the flexibility of Subpart W's language. (*Id.* ¶ 10.) Finally, Mr. Morris declared that "[t]he overall structure of uranium mill cell radon flux testing and remedial provisions in Subpart W and Method 115 are designed to ensure that a source begins taking steps to reduce emissions if it exceeds the standard," and because the Mill was taking steps to cover and reduce emissions and showed improvement in its follow-up emissions tests, "there was no time [Mr. Morris] felt that a compliance action was necessary." (*Id.* ¶ 15.)

### 4. The Trust's Connection to the Mill

In support of its motion for summary judgment, the Trust provided declarations from four Trust members—Yolanda Badback, Thelma Whiskers, Bill Crowder, and Ann Leppanen—who

described their connection to the area around the Mill and the effect the Mill's alleged violations have had on their lives.

Ms. Badback and Ms. Whiskers are both members of the Ute Mountain Ute tribe and have both been members of the Trust since before the filing of this lawsuit. (Dkt. No. 68 Ex. 39 ¶ 2 & Ex. 40 ¶ 1.) The Ute Mountain Ute tribe's reservation is in southeast Utah and includes White Mesa, Utah. (Dkt. No. 68 Ex. 39 ¶ 2.) Ms. Badback is Ms. Whiskers's daughter, and the women reside in the same home along with Ms. Badback's four children (between the ages of 13 and 21) and niece in White Mesa. (*Id.* ¶ 1.) Both women intend to live in White Mesa for the remainder of their lives. (Dkt. No. 68 Ex. 39 ¶ 1 & Ex. 40 ¶¶ 1 & 7.) Both women historically have eaten meat from deer hunted in the area near the Mill, drank well water, and gathered sagebrush and other herbs for medicinal purposes. (Dkt. No. 68 Ex. 39 ¶¶ 4, 9–10, 12–13 & Ex. 40 ¶¶ 2, 5, & 6.) They have ceased such activities in recent years because they fear the effect of the high levels of radon from the Mill. (Dkt. No. 68 Ex. 39 ¶¶ 6, 10, 12–13 & Ex. 40 ¶¶ 6–7.) Now they travel to far-off locations to collect herbs, eat meat from other states, and drink bottled water. (Dkt. No. 68 Ex. 39 ¶¶ 10, 12–13 & Ex. 40 ¶ 6.)

Ms. Badback is forty-two years old, has lived in White Mesa her entire life, raised her children in White Mesa, and declares that "she has no plans to move away." (Dkt. No. 68 Ex. 39 ¶ 1.) She went to school in nearby Blanding, Utah, then worked in Blanding and White Mesa in various jobs until January 2014 when she injured her back. (*Id.* ¶ 3.) Ms. Badback complains that the Mill has created hardships for her everyday life. (*Id.* ¶ 4.) She says the Mill negatively affects the air, water, land, and wildlife, as well as her culture, community, and way of life. (*Id.*) Specifically the dust and smell of chemicals are a problem for Ms. Badback. (*Id.*) She also

suggests that the Mill has caused people in White Mesa to have cancer and that it has poisoned birds. (*Id.*) She says the Mill is built on sacred tribal burial grounds and is killing off sagebrush and other herbs in its vicinity. (*Id.*)

Ms. Badback and her family have participated in efforts against the Mill for about fifteen years. (Dkt. No. 68 Ex. 39 ¶ 5.) Among her many efforts, Ms. Badback traveled to Moab, Utah to attend a meeting where the Mill was discussed and where a woman from an organization called Uranium Watch told her that the Mill's radiation numbers were higher than they should be. (*Id.*) At the same meeting, Ms. Badback met a staff attorney from the Trust who later came to her home and told her that the Mill was using more waste ponds than it should. (*Id.*)

Ms. Badback declares that she had her home tested for radon because of her concerns about the Mill and that she worries about her family breathing radon. (*Id.* ¶¶ 6–7.) As a result of her fears, Ms. Badback and her family go outside less than they did before Ms. Badback went to the meeting in Moab and learned about the high radiation coming from the Mill. (*Id.*) Ms. Badback also complains about heavy dust and smoke from the Mill and says that she was diagnosed with asthma around 2012, which she suspects is related to emissions from the Mill. (*Id.* ¶ 8.) She states that if the Mill were made "to obey the law" and close and properly clean up excess waste ponds, she "might feel a little bit safer living near the Mill [and] . . . might stay outside more." (*Id.* ¶ 15.) She "might" return to her former uses of the land, including eating meat hunted from nearby and collecting herbs. (*Id.*) She desires to see the Mill "stop running" or to run "less often," both of which she says would positively impact her day-to-day life. (*Id.* ¶ 16.)

Ms. Whiskers similarly declares that she feels concern for herself, her family, and her community because of the Mill. (Dkt. No. 68 Ex. 40 ¶ 2.) She says people in her community

suffer asthma and cancer and that sacred places have been disrupted. (*Id.*) Because of health concerns linked to smoke and dust from the Mill, Ms. Whiskers moved her horse corral and worries about the possibility of radiation in the water. (*Id.* ¶¶ 4–5.) She also has witnessed the loss of native herbs, sagebrush, and willows and has had to travel long distances to collect such plants. (*Id.* ¶ 6.) She desires to drink the water, collect herbs, and live free of dust and smells from the Mill. (*Id.* ¶¶ 7 & 9.)

Like Ms. Badback, Ms. Whiskers has advocated against the Mill for many years, including attending the same meeting as Ms. Badback in Moab. (*Id.* ¶ 3.) As a result of that meeting, she came in contact with an attorney from the Trust, with whom she "talked about problems at the Mill." (*Id.*) Although many of her concerns about the Mill are general and relate to its operation, not exclusively to its violation of Subpart W, she does express that she has "heard that some of the waste ponds would be cleaned up if the Court made the Mill stop using some of the waste ponds. If some of the ponds were cleaned up, [she] would worry less about the Mill and how it hurts [her] land and [her] community." (*Id.* ¶¶ 7–8.) She would "feel safer living in White Mesa" if the Mill was made "to close waste ponds or keep its radiation numbers what they're supposed to be." (*Id.* ¶ 9.) She would "feel better" about using herbs and sagebrush for medicine, spending time outside, and having her family remain in White Mesa. (*Id.*)

Husband and wife Bill Crowder and Ann Leppanen are Trust members who live half the year in Bluff, Utah and the other half in St. Paul, Minnesota. (Dkt. No. 68 Ex. 41 ¶ 1 & Ex. 42 ¶ 1.) Both have been members of the Trust since before this lawsuit was filed. (Dkt. No. 68 Ex. 41 ¶ 1 & Ex. 42 ¶ 2.) The couple's Bluff home is approximately twenty miles south of the Mill. (Dkt. No. 68 Ex. 41 ¶ 2.) They say they chose the specific location for their home in part because

Bluff did not, at that time, have the same history of uranium contamination that some of the other towns in the area do. (*Id.* ¶ 8.) The Crowders purchased the land upon which their home now sits in 1998 with the intentions of retiring there. (*Id.* ¶ 2.) They built the home between 2003 and 2013, and they have spent increasing amounts of time in Bluff each year. (*Id.*)

In 2015, Mr. Crowder spent about half the year in Bluff, and he intends to spend at least that much time each year for the rest of his life. (*Id.*) He retired from practicing as a consumer-protection lawyer in 2015 and hopes to spend more time in Bluff moving forward. (*Id.*) He has been going to southeastern Utah for backpacking trips since the mid-1980s and is drawn to its "red rock landscapes, its archeological treasures, its remarkable cultural past, its wide-open vistas and clean air, its wild and remote character." (*Id.* ¶ 3.) When he is in Bluff, Mr. Crowder spends his time hiking and exploring. (*Id.* ¶ 4.) In particular he enjoys investigating rock art in the area. (*Id.*) When he is in Bluff, Mr. Crowder spends between four and five days a week camping and hiking in the area surrounding his home and the Mill. (*Id.*) He has visited Recapture Canyon, Cottonwood Wash, and Westwater Canyon. (*Id.*) These areas range from one to five miles from the Mill. (*Id.* ¶¶ 4–5.) Over the years, he has also camped with Ms. Leppanen, their dogs, and friends in the areas around the Mill. (*Id.* ¶ 6.)

At some point, Mr. Crowder "learned that the Mill had been violating federal legal limits on its emissions of radon and the number of mill ponds it's allowed to use," and after that he limited his use of the areas surrounding the Mill. (*Id.* ¶ 7.) He now avoids hiking in the canyons closest to the Mill and in areas downwind of the Mill. (*Id.*) This includes the areas where he once spent significant time. (*Id.*) He would look for rock art in these areas if not for the Mill's radon emissions, and he does not receive as much pleasure from hiking and exploring the canyons near

the Mill as he once did because of his knowledge of the Mill's activities. (*Id.*) The Mill's conduct has also diminished the pleasure Mr. Crowder receives from his Bluff home, and he now questions whether the home will be the family home for generations, as he and Ms. Leppanen had once hoped. (*Id.* ¶¶ 8–9.)

Mr. Crowder asserts that an injunction and or penalties would "alleviate [his] concerns enough that [he'd] start hiking closer to the Mill and taking more pleasure out of exploring the greater area around the Mill." (*Id.* ¶ 10.) A court-ordered cleanup of the waste ponds, or financial penalty that could be used for cleanup, "would go a long way in eliminating the worries [he has] that the Mill will be a long-term affliction on his home and the area around it." (*Id.*) It would restore the pleasure he receives from his home and the goal of passing it down to future generations of their family. (*Id.*)

Like her husband, Ms. Leppanen has a passion for hiking, exploring, and camping in the areas around the Mill and their home in Bluff. (Dkt. No. 68 Ex. 42 ¶ 5.) She states that they began staying in their home in 2005 and that she has spent more time in Bluff each year since her retirement in October of 2011. (*Id.* ¶¶ 3–4.) In addition to the hiking activities her husband described, Ms. Leppanen is also a Utah state site steward for two archeological sites in Butler Wash, northwest of the Mill. (*Id.* ¶ 6.) Her duties as site steward include at least quarterly visits to the sites to search for vandalism, looting, or other damage and then reporting to the Edge of the Cedars Museum in Blanding. (*Id.*) She intends to be a site steward indefinitely. (*Id.*)

Since learning that the Mill may be violating Subpart W, Ms. Leppanen has limited her use of the area surrounding the Mill. (*Id.* ¶ 7.) This has diminished her pleasure in hiking in the area and caused her to worry about breathing radon and contamination of local water sources.

(*Id.*) She has limited her hikes to Butler Wash and elsewhere and no longer hikes with her dogs for fear that they will drink contaminated water. (*Id.*) She also used to pick wild grape leaves in the Bluff area, including by the creek that flows by her archaeological sites in Butler Wash. (*Id.* ¶ 8) She used the leaves for cooking, but she stopped doing so when she learned of the Mill's excessive radon emissions. (*Id.*) Like her husband, Ms. Leppanen has reduced pleasure from her home, which she had hoped would be "passed down through generations." (*Id.* ¶ 9.) But she declares that if the court were to make the Mill pay penalties and otherwise comply with legal standards, her concerns would be eased (although not eliminated) and she would probably resume hiking closer to the Mill, taking her dogs to the archaeological sites, and picking grape leaves. (*Id.* ¶ 10.)

### LEGAL STANDARD

Summary judgment is proper when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When applying this standard, the court must "view the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party." *Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1298 (10th Cir. 2001).

### ANALYSIS

### 1. Standing

As a threshold matter, the Mill argues that the Trust lacks standing to bring its claims and that the court, therefore, lacks jurisdiction. (Dkt. No. 76 p. 29.) In reviewing a CAA citizen suit, the court must satisfy itself that the statutory requirements are met and that the action presents a case and controversy pursuant to Article III of the Constitution. The CAA citizen-suit provision permits "any person," upon sixty-day's notice, to "commence a civil action on his own behalf"

against a person or entity "who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of . . . an emission standard or limitation" under the CAA. 42 U.S.C. § 7604. And it authorizes federal district courts to consider citizen suits seeking to enforce the CAA through injunctions, specific performance, and civil penalties. *Id.* Here the parties do not dispute that the statutory requirements are met, and the court is satisfied that both parties are proper under the CAA and that the procedural requirements have been met. Therefore, the court concludes that, if the constitutional requirements are met in this case, so too are the statutory standing requirements set out in the CAA.

The parties disagree, however, on whether the Trust satisfies the constitutional standing requirements. (Dkt. No. 76 pp. 29–33; Dkt. No. 85 pp. 7–11.) The federal courts' jurisdiction extends only to actions that present a justiciable case or controversy. U.S. Const. art. III, § 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992). For an action to present a justiciable case or controversy, the plaintiff must have standing to pursue it. *Id.* at 560. A plaintiff has standing if it demonstrates (1) that it "suffered an 'injury in fact'"; (2) that "a causal connection [exists] between the injury and the conduct complained of"; and (3) that it is "'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision.'" *Id.* at 560–61 (citation omitted). Where an association brings a claim on behalf of its members, as the Trust has done, it must show "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.(TOC), Inc.*, 528 U.S. 167, 181 (2000).

"[T]he party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998). Thus, it is the Trust's burden to show each element of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At the summary judgment phase, plaintiffs "must 'set forth' by affidavit or other evidence 'specific facts.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). Because the record reflects, and the Mill does not dispute, that the interests addressed are germane to the Trust's purpose and that the Trust members' participation is not necessary, the only issue is whether individual Trust members would have standing to sue the Mill for the relief the Trust seeks. *See Sierra Club v. Envtl. Prot. Agency*, 762 F.3d 971, 976 (9th Cir. 2014).

The Mill contends that the Trust lacks standing because it has failed to show that any of its members have sustained an "injury in fact." (Dkt. No. 76 pp. 29–30.) For this element to be satisfied, at least one member of the Trust must have been harmed in a manner "that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Laidlaw*, 528 U.S. at 180. The members must have "'a direct stake in the outcome'" of the litigation. *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1155 (10th Cir. 2013) (quoting *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 451 (10th Cir. 1996)). Although "'generalized harm to the forest or the environment will not alone support standing,'" *Palma*, 707 F.3d at 1155 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009)), "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

"A plaintiff who has repeatedly visited a particular site, has imminent plans to do so again, and whose interests are harmed by a defendant's conduct has suffered injury in fact that is concrete and particularized." *Palma*, 707 F.3d at 1156.

The Trust has shown its members have been injured in fact by the Mill's alleged violation of Subpart W. Ms. Badback and Ms. Whiskers state their desire to hunt for herbs, drink well water, eat local game, and spend time outdoors; but they limit or avoid such conduct because of their understanding that the Mill is violating EPA standards and emitting radon beyond what regulatory authorities have deemed safe. Ms. Badback in particular links her diminished time outside her home in White Mesa and collecting herbs in the vicinity of the Mill to its radon emissions. After attending the meeting in Moab, where she learned about excess radiation emissions, and meeting with the Trust's lawyer, who told her about the Mill's use of excess ponds, she had her home tested for radon and worries breathing the air could cause her, or her family, to become ill from radiation. Further, she attributes the loss of local food, well water, and medicine to the Mill. In these ways the Mill's alleged violations of Subpart W have impeded Ms. Badback and Ms. Whiskers's ability to use the land in the area in the manner they have routinely done in the past and would like to do in the future. It has injured them in fact. This is not changed by the fact that both women also raise, as the Mill points out, generalized concerns about chemical odors and dust they attribute to the Mill but not to its violation of Subpart W.

Mr. Crowder and Ms. Leppanen also demonstrated their recreational use of the land near the Mill is reduced by the radon emissions from the Mill in violation of Subpart W. They hike less and no longer visit places they once enjoyed. And Ms. Leppanen no longer picks grape leaves for cooking. Additionally, Ms. Leppanen's statements regarding the archeological sites

that she monitors are particularly pertinent. She has been visiting the sites, which are located to the northwest of the Mill, at least quarterly since April 2012. Her position as a site steward for the State of Utah requires her to go to these sites regularly, and she plans to hold the position indefinitely. Although she has continued to make those visits, she no longer brings her dogs with her and she limits hiking in the area. She would like to return to her prior use of this land. As *Laidlaw* contemplates, she has repeatedly visited Butler Wash and other areas in southeast Utah in proximity to the Mill, she has imminent plans to visit them again as dictated by her commitment as a site steward, but her ability to visit them under the circumstances she finds most enjoyable, without exposing herself to harm, is diminished. These are not generalized harms but actual, ongoing uses of the land that have been curtailed by the Mill's alleged conduct. They are injuries in fact.

The Mill's argument that the Trust members' injuries must be health related because the EPA promulgated Subpart W to prevent harm to human health resulting from radon emissions from the Mill's tailings impoundments is unavailing. (Dkt. No. 76 p. 10.) The CAA's express purpose is to protect health, 42 U.S.C. 7401(b)(1) ("The purposes of this subchapter are—to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."), yet the Tenth Circuit has applied *Laidlaw*'s recreation-only principle in CAA context. *See WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1189 n.10 (distinguishing *Laidlaw*, where injuries were adequately alleged, on the grounds that the alleged negative health effects were generalized to all Coloradans and not specific to WildEarth's members). It is sufficient that, because of their

concerns about the health effects of excess radon emissions, Trust members have reduced their recreational use of the land.

Next, the Mill must show that its alleged injury is "'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560 (alterations in the original) (citation omitted). A fairly traceable connection must be more than "an attenuated connection," *Robbins v. U.S. Dep't of Housing and Urban Dev.*, 72 F. Supp. 3d 1, 7 (D. D.C. 2014), but need not rise to the level of proximate cause, *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005). "Article III does at least require proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." *Id.* The Mill does not argue failure to satisfy the causation requirement, and the members have all stated that they curtailed activity on the land near the Mill after learning of the Mill's violation of either the radon emissions or tailings pond limitations. Accepting their statements as true, there is no question this element has been met. *See Sierra Club v. Tri-State Generation & Transmission Ass'n, Inc.*, 173 F.R.D. 275, 280 (D. Colo. 1997) ("Plaintiff's allegations—that defendants' emissions impair its members' ability to breathe clean air and view natural scenery and wildlife—clearly satisfy [the causation] requirement.").

Finally, the Trust's members' injuries are redressable. An injury is redressable if it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (citation omitted). Here the Trust seeks civil penalties, injunctive relief, and declaratory judgment, all of which would require the Mill to comply with Subpart W (Dkt. No. 29 ¶ 1 & Prayer for Relief), and the Trust members state they would return to their activities on the land if the Mill was made to stop violating Subpart W or pay fines that

could be used to help clean up the Mill's violations. Enforcement of a statute or regulation enacted to protect health interests serves to protect the health of those who desire to use affected land, whether for recreation or other purposes. *Sierra Club v. Johnson*, 436 F.3d 1269, 1279 (11th Cir. 2006) (determining that "concerns about pollution" that reduce a declarant's aesthetic and recreational experience are sufficient to satisfy standing requirement). And civil penalties help remedy a violation and discourage future violations. *Laidlaw*, 528 U.S. at 185–86 ("To the extent that [civil penalties] encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured and threatened with injury as a consequence of ongoing unlawful conduct."). Thus the specific relief and civil penalties that the Trust seeks would, if granted, redress its members' injuries. Because the Trust has shown its members would have standing, it has associational standing and the court is satisfied that it has jurisdiction over this action.

### 2. Number of Tailings Impoundments

In its second claim for relief, Grand Canyon Trust alleges that the Mill has been violating Subpart W's phased disposal work practice, 40 C.F.R. § 61.252(b)(1), which seeks to limit radon emissions in part by prohibiting uranium mills that utilize phased disposal from operating more than two tailings impoundments at any given time.[6] (Dkt. No. 29.) Both parties have moved the court for summary judgment of this claim. (Dkt. Nos. 60 & 67.) The Trust alleges that the Mill began violating the impoundment limit on November 11, 2010, when it constructed Cell 4B while Cells 1, 2, 3, and 4A and Roberts Pond were tailings impoundments in operation and count

---

[6] Phased disposal is "a method of tailings management and disposal which uses lined impoundments which are filled and then immediately dried and covered to meet all applicable Federal standards." 40 C.F.R. § 61.252(f). It is undisputed that the Mill uses phased disposal. (Dkt. Nos. 67 p. 35; 76 p. 20.)

against Subpart W's two-impound maximum. (Dkts. No. 29 & 67 p. 53.) The Mill argues that the statute of limitations to the CAA's citizen-suit provision bars this claim and that, even if the claim is timely, the Mill is not violating § 61.252(b)(1) because Cell 2 is in final closure while Cells 1, 4B, and Roberts Pond were evaporation ponds not within the scope of the phased disposal work practice, leaving only Cells 3 and 4 as operational tailings impoundments.[7] (Dkt. No. 60 pp. 46–48; Dkt. No. 76 pp. 40–49.) Both parties agree that, at the time the summary judgment motions were filed, Cells 3 and 4A were operating tailings impoundments. (Dkt. Nos. 67 p. 53; Dkt. No. 76 p. 20.)

The statute of limitations for CAA citizen suits is five years. 28 U.S.C. § 2462. The limitations period begins to run "as soon as a claim '*first* accrue[s],'" *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 671 (10th Cir. 2016) (emphasis and alteration in original), which in this case is upon construction of a new tailings impoundment or the first use of an existing cell as a

---

[7] The Mill also argues that laches bars the Trust's claim and that the Mill failed to exhaust its administrative remedies before raising this claim. (Dkt. No. 60 pp. 48–52.) The court declines to consider the laches defense because compliance with the statute of limitations generally bars a laches claim and, where the Trust does not comply with the statute, laches is redundant. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S.Ct. 1962, 1967 (2014) ("To the extent that an infringement suit seeks relief solely for conduct occurring within the limitations period, however, courts are not at liberty to jettison Congress' judgment on the timeliness of suit. Laches, we hold, cannot be invoked to preclude adjudication of a claim for damages brought within the three-year window. As to equitable relief, in extraordinary circumstances, laches may bar at the very threshold the particular relief requested by the plaintiff."); *Pres. Coal., Inc. v. Pierce*, 667 F.2d 851, 854 (9th Cir. 1982) ("Laches must be invoked sparingly in environmental cases because ordinarily the plaintiff will not be the only victim of alleged environmental damage. A less grudging application of the doctrine might defeat Congress's environmental policy."). Likewise, the court does not consider the exhaustion defense because the CAA imposes no such exhaustion requirement. *See* 42 U.S.C. § 7604; *see also Citizens for a Better Env't-Cal. v. Union Oil Co. of Cal.*, 83 F.3d 1111, 1119 (9th Cir. 1996) (concluding an action to enforce Clean Water Act requirements was proper even though there remained state administrative remedies to review the state's method of enforcing the relevant CWA requirement). And there is no reason for the court to impose such a requirement on a discretionary basis, as there are no ongoing administrative procedures with which this court's ruling would interfere and because the remedies the Trust seeks are available under the CAA but could not be awarded by a state administrative agency. And the Mill's citations to collateral attack cases are inapposite because the CAA expressly permits this challenge in Claim 2. 42 U.S.C. § 7604.

tailings impoundment, 40 C.F.R. § 61.252(b).[8] The limitations period applies to the Trust's claim

for civil penalties and extends to its request for injunctive and declaratory relief under the

concurrent relief doctrine. *Okla. Gas & Elec. Co.*, 816 F.3d at 670 & 675–76. It is undisputed

that Cell 4B was built within five years of the Trust's complaint, so the court first considers

whether Cell 4B was a tailings impoundment subject to the phased disposal work practice upon

first being constructed.[9] Concluding that Cell 4B is not a tailings impound, the court then

addresses whether any other cells fall within the limitations period and determines that no cell

does. Therefore, no combination of cells constitutes an actionable violation of the work practice.

### a. *Cell 4B Did Not Cause the Mill To Exceed the Phased Disposal Work Practice.*

Subpart W prohibits facilities licensed to manage uranium byproduct materials from

building new tailings impoundments after December 15, 1989, unless those impoundments

comply with certain requirements. 40 C.F.R. §§ 61.250 & 252. For facilities utilizing the phased

disposal method, Subpart W requires (1) that newly constructed impoundments not exceed forty

acres; (2) that such impoundments satisfy standards for uranium byproduct management under

the Atomic Energy Act of 1954; and (3) that no more than two tailings impoundments be "in

operation" at a time, including impoundments that existed prior to December 15, 1989. 40 C.F.R.

§ 61.252(b)(1). The Trust's argument that the construction of Cell 4B, completed on November

11, 2010, violated Subpart W assumes that Cell 4B is an operational tailings impoundment. But

---

[8] "[A] claim accrues as soon as 'the plaintiff can file suit and obtain relief.'" *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 673 (10th Cir. 2016) (quoting *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 134 S.Ct. 604, 610 (2013)). "[T]he clock under § 2462 begins only once, when a claim *first* accrues." *Id.*, 816 F.3d at 673–74 (emphasis in original). And where a citizen suit seeks equitable relief "based on the same facts supporting the time-barred legal claim," the equitable claims are also untimely and therefore barred. *Id.* at 675–76.

[9] The Trust argues Cell 4B violates the phased disposal work practice regardless of whether it was receiving tailings solids or process solutions. But because Cell 4B had not ever received tailings solids at the time the instant motions were filed, the court considers the date of construction.

DAQ approved construction of Cell 4B, concluding that it would not cause the Mill to violate the requirements of Subpart W. (Dkt. No. 64 Ex. 3.) Indeed, DAQ historically had viewed evaporation ponds as distinct from tailings impoundments and had not counted them as part of the two operating tailings impounds. (Dkt. No. 64 ¶ 8.) Although the court is not directly reviewing DAQ's decision to permit construction of Cell 4B, DAQ's interpretation provides a useful starting point. Therefore, the court must first determine how much, if any, deference is owed to DAQ as the agency administering Subpart W in Utah and specifically whether it should defer to DAQ's conclusion that the construction of Cell 4B would not be in violation of Subpart W.

Whether a state agency is entitled to deference when administering federal law is not well settled.[10] According to the Tenth Circuit, a "state agency's determination of procedural and substantive compliance with federal law is not entitled to the deference afforded a federal agency." *AMISUB (PSL), Inc. v. Colo. Dep't of Soc. Servs.*, 879 F.2d 789, 796 (10th Cir. 1989) (reviewing de novo the state of Colorado's Medicaid plan for consistency with the Federal Medicaid Act and relevant federal regulations) (citing *Turner v. Perales*, 869 F.2d 140, 141–42 (2d Cir. 1989), which distinguished *Chevron U.S.A. v. Natural Resources Defense Council*, 467

---

[10] The Mill's motion for summary judgment argues that "DAQ's interpretations and application of subpart W are owed substantial deference." (Dkt. No. 60 p. 43.) In reaching this conclusion, the Mill cites case law that federal agencies are entitled to substantial deference when interpreting their own regulations and that, when an agency delegates its authority, the delegatee is vested with the same authority and therefore deserves the same deference as the delegating agency because it steps into the shoes of the delegating agency. (*Id.* pp. 43–44.) The case law upon which the Mill relies does not, however, address the EPA or the unique circumstances of cooperative federalism embodied in the Clean Air Act. Rather, the Mill relies on cases involving the Federal Communications Commission in which the FCC delegated its authority to a subdivision within the agency. *See Ind. Bell Tel. Co., Inc. v. McCarty*, 362 F.3d 378, 385–87 (2004) (deferring to the expertise of the Wireline Competition Bureau—a division of the FCC—because the WCB was serving as "the voice of the FCC interpreting its own rule"). Such cases are inapposite where, as here, a separate and distinct sovereign has accepted the responsibility of implementing the law of another sovereign.

U.S. 837, 843–44 (1984)). But the Tenth Circuit's conclusion does not preclude all deference to state agencies, and other circuits have concluded that state agencies' regulatory decisions may, nonetheless, merit some deference where the agency is administering federal statutes and regulations upon an express delegation from Congress as long as the agency's interpretation or application is otherwise consistent with federal law. *See, e.g.*, *Ariz. v. City of Tucson*, 761 F.3d 1005, 1014–15 (9th Cir. 2014) (concluding that the relevant state agency was owed "some deference" regarding the environmental issues in a CERCLA consent decree but not in interpreting CERCLA's mandate); *City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 94 (1st Cir. 2008) (noting that "Federal courts generally defer to a state agency's interpretation of those statutes it is charged with enforcing, but not to its interpretation of federal statutes it is not charged with enforcing"); *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507 (2nd Cir. 2002) (observing that no deference is owed to state agency's interpretations of federal laws the agency is not charged with enforcing, implying that some deference is owed where the agency has been charged by Congress or a federal agency with enforcement); *Ritter v. Cecil Cty. Office of Housing & Cmty. Dev.*, 33 F.3d 323, 328 (4th Cir. 1994) (concluding that a state agency charged with administering the federal Section 8 housing program pursuant to congressional authorization should be accorded deference because the agency's regulation was not inconsistent with federal law and "a court may not substitute its own interpretation for the agency's if the agency's interpretation is reasonable").

This is so because the state agency has at least some expertise and Congress likely intended to draw on that expertise when permitting delegation to a state agency. *See City of Tucson*, 761 F.3d at 1014–15 ("[W]here state agencies have some environmental expertise they

are entitled to 'some deference' with regard to questions concerning their area of expertise."); *City of Bangor*, 532 F.3d at 94 (granting some deference to a state agency's decision to enter a consent decree in a CERCLA enforcement action because "the state agency has some expertise," but noting the deference is less than the EPA would receive); *League to Save Lake Tahoe v. Trounday*, 598 F.2d 1164, 1174 (9th Cir. 1979) (concluding that it was proper to defer to the state agency's permitting decision pursuant to the Nevada State Implementation Plan mandated by the Clean Air Act); *Voigt v. Coyote Creek Mining Co., LLC*, No. 1:15-CV-00109, 2016 WL 3920045, at *31 (D. N.D. July 15, 2016) (deferring to the state agency's application of federal law "to the particular circumstances of th[e] case" in issuing a minor source permit under the CAA); *Nw. Envtl. Def. Ctr. v. Cascade Kelly Holdings LLC*, 155 F. Supp. 3d 1100, 1124–25 (D. Or. 2016) (deferring to a state agency implementing the Clean Air Act and the Oregon SIP because Congress directly contemplated state involvement and the state agency had environmental expertise).

The Supreme Court's view of the EPA's role in overseeing state agencies' administration of the Clean Air Act supports some deference to DAQ. *See Alaska Dep't of Envtl. Conservation v. Envtl. Prot. Agency*, 540 U.S. 461, 490–91 (2004). In *Alaska Department of Environmental Conservation v. EPA*, the Court instructed that the EPA should not "step in" and involve itself in state administration of the CAA unless the "state agency's" application of the relevant standard is "not based on a reasoned analysis." *Id.* at 490 (citation and quotation marks omitted). It continued that, while the EPA serves a "limited but vital role in enforcing [CAA standards]," the statutory "scheme . . . places primary responsibilities and authority with the States, backed by the Federal Government." *Id.* at 491 (citation and quotation marks omitted); *see also League to Save*

*Lake Tahoe*, 598 F.2d 1164, 1174 n.11 (9th Cir. 1979) ("In its findings in Subchapter I of the Act, Congress explicitly stated that 'the prevention and control of air pollution at its source is the primary responsibility of States and local governments.'" (quoting 42 U.S.C. § 7401(a)(3)). Here, DAQ is entitled to some deference because it is applying federal regulations pursuant to Congress's express authorization in a manner that is not inconsistent with federal law and is reasonable.

First, DAQ's conclusion merits deference because Congress invited state agency involvement in HAP regulation by authorizing states to apply to the EPA for approval to become the implementing and enforcing body. 42 U.S.C. § 7412(l). Utah satisfied all statutory and regulatory requirements in 1995 and, effective May 15, 1995, the EPA "delegate[d] its authority for the implementation and enforcement of [many of the] . . . National Emission Standards for Radionuclides for all sources located, or to be located in the State of Utah," including Subpart W. Approval of Delegation of Authority; National Emission Standards for Hazardous Air Pollutants; Radionuclides; Utah, 60 Fed. Reg. 13,912–13 (March 15, 1995). Thus, as Congress contemplated, DAQ has administered Subpart W for over twenty years. (Dkt. No. 64 ¶ 4.) And although Congress authorized the EPA to intervene and enforce a regulation when a state has failed to do so, 42 U.S.C. §§ 7412(l)(6) & 7413(a), the EPA has not exercised that authority with respect to the Mill.

Second, DAQ's conclusion that construction of Cell 4B did not cause the Mill to violate Subpart W is not inconsistent with federal law. Subpart W defines existing impounds as "any uranium mill tailings impoundment which is licensed to accept additional tailings and is in existence as of December 15, 1989." 40 C.F.R. § 61.251(d). It defines tailings, in conjunction

with "uranium byproduct material," as "the waste produced by the extraction or concentration of uranium from any ore processed primarily for its source material content. Ore bodies depleted by uranium solution extraction and which remain underground do not constitute byproduct material for the purposes of this subpart." *Id.* § 61.251(g). "[O]peration means that an impoundment is being used for the continued placement of new tailings or is in standby status for such placement. An impoundment is in operation from the day that tailings are first placed in the impoundment until the day that final closure begins." *Id.* § 61.251(e). Finally, "phased disposal" is "a method of tailings management and disposal which uses lined impoundments which are filled and then immediately dried and covered to meet all applicable Federal standards." *Id.* § 61.252(f). But Subpart W does not define either "tailings impoundments" or "final closure." The CAA is also silent on the matter.

Therefore, DAQ had to interpret the rule when presented with the task of approving Cell 4B. In light of these gaps in the definitions and aware that at least Cells 3 and 4A were used as tailings impoundments, DAQ permitted Cell 4B to be built, concluding that doing so would not result in a violation of 40 C.F.R. 61.252. (Dkt. No. 64 Ex. 3.) Thus, DAQ implicitly adopted the position that "tailings impoundments" were only those containing tailings solids, not evaporation ponds, which receive only process solutions and other liquids. This does not contradict the definitions set out in Subpart W, and it is consistent with past EPA interpretation of the phased disposal work practice. (Dkt. No. 64 ¶¶ 2–9 & Ex. 1.) The Trust argues that the definition of "tailings" encompasses all waste produced, including liquids, and for that reason declining to treat evaporation ponds as impounds is contrary to the Subpart. (Dkt. No. 67 pp. 54–59.) While Subpart W's definition of "tailings," if read in isolation, may be broad enough to include liquids

deposited in the evaporation ponds, the definition of phased disposal makes the Trust's argument impossible because it contemplates filling and covering. Evaporation ponds by their very nature do not remain full. And covering requires a stable base upon which to apply the cover, which would sink to the bottom of a liquid-filled evaporation pond. Thus, the definitions in Subpart W, when taken together, do not contradict DAQ and the definition of phased disposal appears to support DAQ's conclusion.

Third, DAQ's interpretation is reasonable. It distinguishes solids, which will remain permanently on the Mill site, from liquids, which evaporate. As stated, Subpart W's definition of phased disposal involves events that would never happen at an evaporation pond—filling, drying, and covering. And Method 115 also contemplates the limitation by requiring testing of beaches, surface, and sides. Method 115 § 2.1.3. Evaporation ponds have no beaches or surface as they are entirely submerged. And, as Method 115 notes, water covered areas are assumed not to emit at all. *Id.* § 2.1.3(a). It is also reasonable as a practical matter because evaporation ponds are necessary to operation of the Mill. (Dkt. No. 68 Ex. 9 pp. 85–86 & 90–92; Dkt. No. 77 Ex. 6 p. 6389.) If evaporation ponds were considered tailings impoundments, at least one impound would have to be used for evaporation, leaving only one impound for tailings solid. As a result, the Mill would be forced to close anytime a cell receiving tailings solids became full, and it would have to remain closed until final closure had begun and a new tailings impoundment had been constructed and was ready to receive solid waste.

The conclusions of other regulating agencies also support the reasonableness of DAQ's approach. For instance, the Nuclear Regulatory Commission amended the Mill's Source Material License, permitting the Mill to receive and process uranium byproduct material and permitting

discharge of process solutions into Cell 4A at a time when Cell 1 was receiving process solutions and Cells 2 and 3 were both receiving tailings solids. (Dkt. No. 63 Ex. 3 EFR 378.) Therefore, NRC's permitting decision authorized a new cell when three others were operating because it distinguished evaporation ponds from tailings impoundment. Similarly, Phil Goble of the DRC stated on February 19, 2014, that the Mill operated only two tailings cells—noting that Cell 4B was "used for liquid management" and had not ever received tailings. (Dkt. No. 66 Ex. 2 p. 1.)

The Trust, however, points the court to an EPA statement from 1986 in which it referred to "slimes," i.e., process solutions, as tailings as evidence that EPA believed evaporation ponds contained tailings and were therefore tailings impoundments. (Dkt. No. 68 Ex. 50 GCT525, 535.) The court is unpersuaded, however, because, aside from occasionally defining "tailings" broadly in contexts divorced of the relationship to tailings impoundments for purposes of Subpart W, the EPA never took the position contrary to DAQ's while it was the regulating authority nor has it seen fit to intervene in DAQ's regulatory approach. In fact, EPA's recent revision of Subpart W expressly excludes evaporation ponds from the phased disposal work practice. Revisions to National Emission Standards for Radon Emissions from Operating Mill Tailings, 82 Fed. Reg. 5,142 (Jan. 17, 2017). The preamble to the new rule makes clear that "Subpart W . . . does not apply to impoundments constructed for the purpose of managing liquids generated by closure or remediation activities, when they are used solely for that purpose." *Id.* at 5,166. Instead, Subpart W only begins to apply once the impoundment receives tailings or uranium byproduct material. *Id.* at 5,167. As such, the new rule defines conventional impoundments—those receiving tailings or uranium byproduct material that will be left in place upon facility closure—and nonconventional impoundments—those that are used for managing liquids and "contain[]

uranium byproduct material or tailings suspended in and/or covered by liquids." *Id.* at 5,179. It

then amends the phased disposal work practice to clarify that it only applies to conventional

impoundments. *Id.* In other words, the new rule codifies the distinction between tailings

impoundments and evaporation ponds that the Mill argues for on summary judgment and that is

reflected in the DAQ's conclusion that Cell 4B did not cause the Mill to violate Subpart W.

Given the consensus among the agencies, the court defers to DAQ's expertise.

    *b. The Statute of Limitations Precludes Review of All Other Cells.*

    The Trust contends that even if Cell 4B did not fall within § 61.252(b)(1), the Mill was

nonetheless violating the impoundment limit because Cell 2 had not entered final closure when

Cell 4A began to receive the tailings solids in 2008. But the statute of limitations has run on any

remaining combination of cells. It is undisputed that Cell 2 began accepting tailings before 1989

and that Cell 3 has been accepting tailings since its construction was complete sometime in the

1980s. (Dkt. No. 67 p. 37; Dkt. No. 68 Ex. 14 EFR 4353; Dkt. No. 76 p. 25.) Cell 4A was under

construction until sometime after Cell 2 began closure in 2008, and it began receiving tailings in

October 2008.[11] (Dkt. No. 68 Ex. 12 p. 23 & Ex. 16 pp. 134–39.) Cell 1 and Roberts Pond only

ever served as evaporation and catchment basins respectively, and they were built well before the

five-year limitations period. (Dkt. No. 61 ¶ 28; Dkt. No. 63 Ex. 14 EFR 467.) Because Cell 4B is

an evaporation pond that does not count against the two-cell limitation and because no other cell

was constructed within five years of the amended complaint, no "new tailings impoundment"

triggered the phased disposal work practice. 40 C.F.R. § 61.252(b). Thus, the Mill is entitled to

summary judgment of Claim 2, which is DISMISSED with prejudice.

---

[11] Even if Cells 1, 2, and Roberts Pond were tailings impoundments, it is undisputed that they were completed and accepting materials well before the five-year limitations period.

### 3. Excessive Radiation

Finally, the Trust contends that the Mill failed to comply with Subpart W's radon flux limit in 2012 and 2013. Specifically, the Trust says that Cell 2 exceeded 20 pCi/(m$^2$-sec) in 2012 and 2013 and that Cell 3 did the same in 2013. (Dkt. No. 67 pp. 46–49.) The Trust also argues that the Mill improperly scheduled and conducted testing of Cell 3 and that those improprieties violated Subpart W. (*Id.* pp. 49–53.) In light of these alleged violations, the Trust seeks an enforcement order under the CAA that would require the Mill to comply with the standards set forth in Subpart W. (Dkt. No. 29 ¶¶ 44, 54, 60, & 62.) It also seeks an injunction against further radon-222 emission in violation of Subpart W and civil penalties for the Mill's alleged violations. (*Id.* Prayer for Relief.) As an initial mater, the Mill argues these claims are moot. Because the mootness doctrine bears on the court's jurisdiction, the court first concludes these claims are not moot and then considers the alleged violations of Subpart W's radon flux limit.

#### a. Mootness

The Mill contends that all claims that it violated the radon flux limit are moot because it is now in compliance, having brought radon-222 emissions at Cells 2 and 3 below 20.0 pCi/(m$^2$-sec). (Dkt. No. 60 pp. 55–58.) There are two forms of mootness: constitutional and prudential. *S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997). If a claim is constitutionally moot, the court does not have power to adjudicate the claim. *See WildEarth Guardians*, 690 F.3d at 1182. Constitutional mootness applies when "a plaintiff has standing at the beginning of a case, but, due to intervening events, loses one of the elements of standing during litigation." *Id.* If a "'real and specific controversy admitting of specific relief through a decree of a conclusive character'" ceases to exist at any time during litigation, "[a] federal court

has no power to give opinions . . . or declare principles of law which cannot affect the matter in issue in the case before it." *Smith*, 110 F.3d at 727 (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). A claim is constitutionally moot if there is no longer a live controversy and "the defendant shows it is 'absolutely clear' that [the complained-of] conduct 'could not reasonably be expected to recur,' thereby negating the potential deterrent value of the suit." *WildEarth Guardians*, 690 F.3d at 1186 (quoting *Laidlaw*, 528 U.S. at 189).

The Mill argues that its alleged emissions violations are no longer redressable because both Cells 2 and 3 are presently in compliance with Subpart W. While there may be no current violation, and therefore no live controversy, the Trust's claims are not moot for two reasons. First, it is possible that the Mill's radon flux violation will recur despite its best remediation efforts. In *WildEarth Guardians*, the court concluded the relevant conduct would not likely recur where a power plant was constructed amid a changing regulatory background and allegedly without a permit. 690 F.3d at 1186–87. There the court was persuaded because of changes to the relevant regulations and other circumstances beyond the defendant's control, because of the defendant's efforts to comply in the face of those changes, and because penalties enforcing the old regulations would have no deterrent effect. *Id.* Unlike in *WildEarth Guardians*, it is at least possible that the Mill will violate again, given the volatility of radon emissions and the difficulty of keeping radon emissions consistently low, as illustrated by the Mill's prolonged struggle to reduce emissions and the occasional spike in radon emissions demonstrated by the Mill's testing records. (Dkt. No. 84 Ex. 1 & 2.) Thus, the Mill has not met the high bar for showing violations will not recur.

Second, when a claim is for damages or other monetary relief, the claim can still be redressed. *See* 13C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Jurisdiction* § 3533.3 (3d ed. 2017). And "in most citizen suits, a plaintiff's claim for civil penalties is not rendered moot by the defendant's compliance with the law because the plaintiff retains a concrete interest in deterring the defendant from future violations." *WildEarth Guardians*, 690 F.3d at 1186. Here the threat of civil penalties is an ongoing deterrent and could redress for the Mill's past violations. Therefore, the claims alleging radon flux limit violations are not constitutionally moot.

In some instances the court may have the power to decide a case but nevertheless decline to do so because the controversy before it is "'so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant.'" *Smith*, 110 F.3d at 727 (quoting *Chamber of Comm. v. United States Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980)). Such issues are prudentially moot. *See Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1209 (10th Cir. 2012). Because claims for equitable relief remain in the "remedial discretion" of the court, when a "plaintiff seeks equitable relief already being provided by coordinate branches of government" without some justification for duplicative efforts, the court can exercise its discretion and dismiss the case on prudential mootness grounds. *Id.* at 1209–10. But "[t]his doctrine generally applies only to requests for injunctive or declaratory relief." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1122 (10th Cir. 2010) (citing *Building & Construction Department v. Rockwell International Corp.*, 7 F.3d 1487, 1492 (10th Cir. 1993), in which the court determined that all cases applying prudential mootness were for prospective equitable relief).

Because the Trust seeks civil penalties, and not just prospective equitable relief, the prudential-mootness analysis is not appropriate here. *See Rio Grande Silvery Minnow*, 601 F.3d at 1023.

    *b. Cell 2*

In Claim 1 of the Amended Complaint, the Trust contends that the Mill exceeded the radon flux limit and therefore violated Subpart W in 2012 and 2013. (Dkt. No. 29 ¶ 41.) Subpart W states, "Radon-222 emissions to the ambient air from an existing uranium mill tailings pile shall not exceed 20 pCi/(m$^2$-sec) (1.9pCi/(ft$^2$-sec)) of radon-222." 40 C.F.R. § 61.252(a). Cell 2 averaged 25.9 pCi/(m$^2$-sec) in 2012 and 20.4 pCi/(m$^2$-sec) in 2013 (Dkt. No. 68 Ex. 26 GCT 8875 & Ex. 29 GCT 8226). It is uncontested that Cell 2 exceeded the limit set out in Subpart W. And a self-reported violation of an applicable limit is sufficient to create liability. *See, e.g.*, *Concerned Citizens around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 679–81 (E.D. La. 2010) (granting summary judgment with respect to liability for a CAA violation based only on the defendant's self-reported violations, where there were nineteen self-reported violations over an almost five-year period); *St. Bernard Citizens v. Chalmette Refining*, 354 F. Supp. 2d 697, 706–07 (E.D. La. 2005) (granting summary judgment on the issue of liability for thirty-four self-reported permit violations); *Sierra Club v. Pub. Serv. Co. of Colo., Inc.*, 894 F. Supp. 1455, 1458–61 (D. Colo. 1995) (determining only that the defendant's self-reported data was proof of liability of a violation and doing so when, on previous such violations, the state agency had first taken no action and later required only a small civil penalty. Thus, Cell 2 would have violated of Subpart W in 2012 and 2013 if it had been subject to Subpart W.

But the Mill argues Cell 2 was not subject to Subpart W at the relevant time; the court agrees.[12] The Mill claims Subpart W does not apply to impoundments that are closed and that, as a result, it did not apply to Cell 2 after 2008, when the impoundment ceased being an operating existing mill impoundment. (Dkt. No. 60 p. 52.) Subpart W is entitled "National Emission Standards for Radon Emissions From *Operating* Mill Tailings." 40 C.F.R. § 61.250–256 (emphasis added). It applies to facilities "during and following the processing of uranium ores." *Id.* § 61.250. It "does not apply to the disposal of tailings." *Id.* Subpart W defines "operation" to "mean[] that an impoundment is being used for the continued placement of new tailings or is in standby status for such placement. An impoundment is in operation from the day that tailings are first placed in the impoundment until the day that final closure begins." *Id.* § 61.251(e). And the process of phased disposal includes the "immediate[e] dry[ing] and cover[ing]" of an impoundment, in accordance "with all applicable Federal standards," once the impoundment becomes full. *Id.* § 61.251(f).

It is undisputed that Cell 2 ceased receiving tailings by at least 2008. (Dkt. No. 60 p. 18; Dkt. No. 67 p. 61; Dkt. No. 68 Ex. 16 pp. 164–65.) Therefore, Cell 2 was not involved "during" uranium processing, leaving open the question of whether it was simply "following" uranium processing or if it had moved into "disposal." None of those terms, which are used to define the scope of Subpart W, are defined in the regulation. But the title of Subpart W indicates "operating" is key to the scope of the regulation, and definition of "operation" makes clear that

---

[12] The Mill also argues that, if Subpart W applies, it is not liable for exceeding 20 pCi/(m2-sec) because Subpart W has an automatic remedy, and it complied with that remedy. (Dkt. No. 60 pp. 52–53.) Subpart W requires a "facility [that] is not in compliance with the emission limits" to "commence reporting . . . on a monthly basis . . . . [and] monthly reports shall include [a]ll controls or other changes in operation of the facility that will be or are being installed to bring the facility into compliance." 40 C.F.R. § 61.254(b). The court declines to consider this because it concludes that Subpart W does not apply. It notes, however, that Subpart W's requirements do not supplant the remedies Congress made available in the CAA citizen-suit provision.

an impoundment is no longer in operation when it has ceased being used for placement of tailings and will never again be used for placement of tailings. That definition is satisfied here. The undisputed facts are that Cell 2 did not receive tailings after 2008, and because Cell 2 was full, there is not even an inference that it was in standby awaiting additional tailings. (Dkt. No. 68, Ex. 16 pp. 165–66.) In fact, the Mill placed a four-foot cover across the entire cell in 2008 and began dewatering sometime in 2008 or 2009. (Dkt. Nos. 61 ¶16 & 68 Ex. 16 pp. 167–68.) That is, it was impossible after 2008 to place tailings in Cell 2, and it was therefore out of operation and not subject to Subpart W.

Nevertheless, the Trust insists Subpart W did apply, contending that an impoundment is in operation until final closure begins and that final closure cannot begin until DRC has approved a final reclamation plan that provides for application of the final radon barrier and sets deadlines for establishing the steps toward reclamation. (Dkt. No. 67 pp. 60–64.) It supports this argument by pointing to the definition of "phased disposal," which subjects the process of filling and covering an impoundment to all relevant federal standards. 40 C.F.R. § 61.251(f). And it cites Nuclear Regulatory Commission regulations that specify criteria for approval of a reclamation plan, 10 C.F.R. Pt. 40, Appx. A, to support its claim that the Mill's reclamation plan is inadequate as it lacks deadlines for completing the steps in the cell-closure process.

But the NRC regulations do not address the scope of Subpart W. The NRC's regulations set out "procedures and criteria for the issuance of licenses to receive title to, receive, possess, use, transfer, or deliver source and byproduct material" and "provide[] for the disposal of byproduct material and for the long-term care and custody of byproduct material and residual radioactive material." 10 C.F.R. § 40.1. They do not set the standard for identifying an operating

tailings impoundment. As stated above, the first sentence of the definition of "operation" clearly does not apply to Cell 2, and the second sentence simply refers to "the day that final closure begins." Because the definition provides for no category of impoundment other than those (1) receiving or in standby to receive tailings and (2) those having reached the first day of final closure, the court must assume the first day that final closure begins is the same day that the cell ceases to receive or be on standby to receive tailings. And "the day that final closure begins" implies no progress need actually have been made toward closure but only that from the moment the impoundment ceases receiving tailings the closure process has begun and the impoundment ceases to be in operation. Therefore, the court is unpersuaded by the argument that the NRC's reclamation plan requirements dictate the application of Subpart W.

The Mill next argues that, even if Cell 2 was in final closure, the Mill and DAQ proceeded as if the Mill was subject to the radon flux limit and that the court should defer to this course of conduct. The Mill provided annual reports for 2012 and 2013, and for both years DAQ concluded that Cell 2 was "in violation" of the 20 pCi/(m$^2$-sec) limit and that monthly reporting was necessary until such time as the Mill complied with the radon flux limit. (Dkt. No. 68, Ex. 26 GCT 8871 & Ex. 29 GCT 8226–27.) It is true that neither the Mill nor DAQ appear to have questioned the application of Subpart W until 2014, when DEQ, DAQ, and DRC expressed in a letter that the Mill could cease monthly monitoring under Subpart W but that Cell 2 must remain below 20 pCi/(m$^2$-sec). (Dkt. No. 63, Ex. 38 UTAH767–68.) According to the agencies' letter, compliance with the limit would from then on be measured following Method 115 but reported on a semiannual basis to DRC. (*Id.*) The letter clarifies the closure status of Cell 2, but states Cell 2 must still be monitored for radon flux, using the limit set out in Subpart W.

Therefore, it is at least possible the parties did not reconsider the issue until 2014 because as a practical matter, the Mill had to report radon-222 emissions and the agencies were not concerned about which regulation it was applying. But even if the DAQ believed Cell 2 was subject to Subpart W during 2012 and 2013, the court owes that conclusion no deference. DAQ's conduct, whether it intended it or not, directly contradicted the plain language of the regulation, which is a legal issue for the court to resolve, especially where it does not require the expertise of the agency as do some of the other issues presented in this action.

The court concludes Cell 2 was not at the relevant time subject to Subpart W's radon flux limit. Hence, it GRANTS the Mill's motion and DENIES the Trust's as to Claim 1.

*c. Cell 3*

Cell 3 exceeded 20 pCi/(m$^2$-sec) in June 2013, but the Mill recorded results in September and December that it then averaged with the June results to reach a reported yearly average of 19.4 pCi/(m$^2$-sec) for 2013. (Dkt. No. 65 Ex. 2 GCT 8279; Dkt. No. 67 pp. 48–49; Dkt. No. 68 Ex. 30 GCT 8289, 8318, 8320, 8351 & 8353 & Ex. 32 EFR 24924.) Based on the yearly average, DAQ concluded Cell 3 was not in violation of Subpart W for 2013. The Trust argues, however, that the Mill failed to comply with the measurement and reporting requirements set out in Subpart W and Method 115 in conducting the September and December tests, and therefore, that the court should ignore all but the June 2013 test and find that a violation occurred. (Dkt. No. 67 pp. 37–38.) The Mill responds that the scheduling and testing were proper, and DAQ determined the Mill had committed no violation. (Dkt. No. 65 ¶ 7 & Ex. 2 GCT8279.) The court considers the Mill's conduct in light of DAQ's determination and takes the Trust's claims in the order they are presented in the complaint.

### i. Scheduling

Claim 3 asks the court to find that the Mill violated Subpart W's scheduling requirement. (Dkt. No. 29 ¶ 54.) The scheduling requirement states:

> Compliance with the emission standard in this subpart shall be determined annually through the use of Method 115 of appendix B. When measurements are to be made over a one year period, EPA shall be provided with a schedule of the measurement frequency to be used. The schedule may be submitted to EPA prior to or after the first measurement period. EPA shall be notified 30 days prior to any emissions test so that EPA may, at its option, observe the test.

40 C.F.R. § 61.253. The Trust advocates a narrow reading of the plain language of the regulation. (Dkt. No. 67 p. 49.) It focuses on the regulation's use of the singular articles "a" and "the" to modify "schedule" and its use of the disjunctive "or" between "prior to" and "after." (*Id.* at 49–50.) The Trust contends that the singular articles show that the Mill should only have submitted one schedule per year and that the disjunctive "or" means that if a schedule is submitted before testing, one cannot also be submitted after testing. While the Trust's reading of the regulation is not unreasonable, the Mill's method of scheduling is not precluded by the plain language.

According to Jay Morris, the Minor Source Compliance Section Manager at DAQ charged with compliance oversight of the Mill during the relevant time, he did not believe the Mill violated the scheduling requirement, because he understood the standard to be flexible enough to accommodate the Mill's practice of scheduling additional tests after the results of the initial test exceeded the regulatory limit. (Dkt. No. 65 ¶ 9.) Mr. Morris pointed to the use of the word "or" as support for the view that there is flexibility to the scheduling requirement. That is, he believed the regulation permitted scheduling before, after, and both before and after.

His reading is bolstered by the possibility of submitting a schedule "after the first measurement period," which implies that the EPA had anticipated what occurred here—that a mill might determine multiple rounds of testing were needed after an initial test exceeded the regulatory limit. Mr. Morris's conclusion is further supported by the use of "any" in the final sentence. "Any" implies an indeterminate number and is not necessarily singular. *See Any*, Merriam-Webster Dictionary (Online ed. 2017), https://www.merriam-webster.com/dictionary/any (defining "any" as "one or some indiscriminately of whatever kind; one or another taken at random . . . [or] every"). And while "any" is used to modify the number of tests, not the number of schedules, it suggests that the goal was to ensure the EPA had the opportunity to observe all testing. If a schedule was not set until after the first measurement period, according to the Trust's reading, the EPA would not have such notice. Therefore, the combination of the multiple possible testings, the possibility of setting the schedule after the first testing, and the requirement that the EPA receive notice of each testing, including the first, suggests that the EPA was open to receiving multiple schedules. Additionally, the word "may" is permissive, which supports Mr. Morris's conclusion. (Dkt. No. 60 p. 54.)

Further, DAQ's reading is reasonable. As Mr. Morris stated, a flexible scheduling protocol supports the EPA's intended goal for the testing requirements of Subpart W—to encourage remediation and, in turn, reduce emissions. (Dkt. No. 65 ¶ 15.) Permitting multiple schedules effectively means permitting the Mill to retest if the results from the originally scheduled test exceed the limit. The Trust argues post hoc modifications to the schedule allow the Mill to escape liability where a single test result violated the Subpart. This may be true, but the purpose of Subpart W and the CAA is not simply to punish offenders. Rather it is to protect

the health and well-being of the public by enhancing the Nation's air quality. *See* 42 U.S.C. § 7401. This goal is most effectively achieved by allowing repeat testing. The rigid scheduling requirement the Trust advocates could in theory permit a facility to test and discover violations in January of a given year and then to operate with those violations until March of the following year without attempting to reduce emissions during that time. On the other hand, the Mill's approach incentives immediate remediation and, therefore, reduced emissions. A rigid reading of the regulation creates perverse incentives contrary to Congress's stated purpose and contrary to the practice of the expert agency. Thus, the court defers to its expertise on this matter.

### ii. Testing Locations

The Trust next contends that the Mill violated Method 115's measurement protocols in September and December 2013.[13] DAQ was aware of the Mill's testing methods, and DAQ found no such violation. (Dkt. No. 65 ¶¶ 8, 10.) About the locations used for testing, Mr. Morris stated "it met our requirements, . . . we knew that the Mill was taking steps to address those areas of Cell 3 with high radon levels, and . . . the sampling results showed a trajectory of improvement." (*Id.*) Mr. Morris cites the flexibility of the introductory language to Method 115, § 2.1.1, which permits measurements made on one occasion or on several, as evidence of the flexibility of Method 115 overall. (Dkt. No. 65 ¶ 10.) Indeed the language is flexible and was administered by an agency that knew what the Mill was doing and knew the Trust's concerns but permitted this method of testing. The court will not disrupt the monitoring and regulation where

---

[13] In the complaint the Trust argues violations both in the regions where testing was conducted and in the ambient air temperature during at least one of the subsequent rounds of tests. (Dkt. No. 29 ¶¶ 58–59.) It does not raise the temperature argument at summary judgment. And because it appears the analysis regarding the temperature is the same as regarding the location for testing, were that issue to be raised, the court would defer to DAQ with regard to the temperature as well.

the standard is flexible and Congress intended for the state to be the primary regulating entity. Because the court defers to DAQ with regard to scheduling and testing method, it concludes that the September and December tests were not invalid. Therefore, the reported yearly average was valid and Cell 3 was not in violation of the radon flux limit in 2013.

**CONCLUSION**

For the reasons stated herein, the court hereby GRANTS the Mill's motion (Dkt. No. 60) and DENIES the Trust's motion (Dkt. No. 67).

DATED this 15th day of September, 2017.

BY THE COURT:

Clark Waddoups
United States District Judge